**Lisa O. CAUTHEN, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. CIV.A. 3:00CV298WS.**

United States District Court,
S.D. Mississippi,
Jackson Division.

March 26, 2001.

Lance L. Stewart, Lance L. Stewart, Attorney, Jackson, for Lisa O. Cauthen, plaintiffs.

Mitzi Dease Paige, U.S. Attorney's Office, Jackson, for Commissioner of Social Security, Kenneth S. Apfel, Commissioner, defendants.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Before the court is the Report and Recommendation of the United States Magistrate Judge, recommending that the decision of Kenneth S. Apfel, the Commissioner of Social Security, be reversed and the case remanded for an award of benefits. Plaintiff, Lisa O. Cauthen, was born on April 29, 1958, and was 43 years of age at the time of the decision by the Administrative Law Judge. She has a college degree in home economics education. She also completed cosmetology school. From 1981 until August of 1996, she worked as a school teacher. She has also worked part-time in a jewelry store, has owned a beauty salon, and has worked as a cosmetologist. She alleges that she is disabled due to chronic fatigue syndrome and fibromyalgia. Plaintiff's application for disability was denied by the Mississippi Disability Determinations Service, the Administrative Law Judge and by the Appeals Council for the Social Security Administration in Washington, D.C.

The Magistrate Judge's recommendation of reversal and remand of the defendant's decision is based primarily upon the decision of the Administrative Law Judge (hereinafter "ALJ") for the Office of Hearings and Appeals to give less than controlling weight to the medical opinions of Dr. R.H. Flowers, III, and Dr. Joseph Terry, two physicians who treated the plaintiff Lisa O. Cauthen. The Magistrate Judge found "particularly troubling" the ALJ's rejection of the opinions of these two treating physicians, especially the opinion of Dr. Flowers. Furthermore, the Magistrate Judge concluded that the ALJ incorrectly had relied upon the first hypothetical question proposed to the Vocational Expert, rather than a hypothetical more favorable to the plaintiff, opining that the first hypothetical did not contain all the plaintiff's impairments. Thus, according to the Magistrate Judge, this case not only should be should be remanded, but also remanded for an award of benefits. For the reasons hereinafter set out, this court disagrees and hereby declines to follow the Magistrate Judge's Report and Recommendation.

## STANDARDS OF REVIEW

Regarding the review of the Commissioner's decision, judicial review may only determine whether substantial evidence supports the Commissioner's final decision, and whether the Commissioner applied the correct legal standards. Also, absent factual or legal error, the court cannot remand the case for further proceedings. *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989); *Austin v. Shalala*, 994 F.2d 1170, 1174 (5th Cir. 1993); Title 42 U.S.C. § 405(g); *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir.1994). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," being "more than a scintilla, but less than a preponderance." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Moreover, evidentiary conflicts are for the ALJ to decide. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir.1990). The court, however, must scrutinize the entire record to ascertain that substantial evidence supports the Commissioner's decision. *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir.1988). If the evidence supports the Commissioner's decision, then the decision is conclusive and must be upheld. *Paul v. Shalala*, 29 F.3d 208, 210 (5th Cir.1994). Also, the trial court is not to reweigh the evidence in the record, try any issues de novo, and must not substitute its judgment for that of the Commissioner, even if there is evidence that weighs against the Commissioner's

final decision. *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir.2000).

Regarding this court's review of the Report and Recommendation of the United States Magistrate Judge, Rule 72 of the Federal Rules of Civil Procedure and Title 28 U.S.C. § 636 govern review of the Magistrate Judge's orders. Pursuant to Title 28 U.S.C. § 636(b)(1)(A), a district court may modify or set aside any portion of the Magistrate's order relating to a non-dispositive motion only if it is clearly erroneous or contrary to law. Rule 72(a) of the Federal Rules of Civil Procedure similarly states that a district court must apply the clearly erroneous standard, a deferential standard of review. However, with regard to dispositive matters where the Magistrate is required to make a Report and Recommendation to the District Judge with findings of fact and conclusions of law, the district court shall make a *de novo* determination of the Magistrate's ruling on issues which a party has filed a specific written objection. *United States v. Wilson,* 864 F.2d 1219, 1221 (5th Cir.), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989) (a district court must engage in de novo review where a party has objected to a magistrate's decision); *Koetting v. Thompson,* 995 F.2d 37, 40 (5th Cir.1993) (party filing written objections to the magistrate judge's findings was entitled to a de novo review by the district court).

### THE MEDICAL EVIDENCE BEFORE THE ALJ

The medical record reviewed by the Magistrate Judge begins with the statement that on January 29, 1997, the plaintiff was referred to Dr. R.H. Flowers, III, at the request of Dr. Joseph Terry, a physician with the MEA Medical Clinic in Jackson, Mississippi. The record says that Dr. Terry had found the plaintiff to be suffering with mononucleosis in August of 1996. Dr. Terry's notes state that the plaintiff's recovery progressed slowly, and that he decided to refer the plaintiff to Dr. Flowers for an examination to determine whether the plaintiff could be suffering from chronic fatigue syndrome. According to Dr. Flowers' notes, the plaintiff appeared before him for consultation on January 29, 1997, saying that she had developed numerous additional symptoms after her bout with mononucleosis, including: severe fatigue unrelieved by rest and associated with a greater than fifty percent reduction in her overall activity level; insomnia with occasional hypersomnia; myalgias; muscle weakness; post-exertion fatigue; arthralgias without joint swelling; paresthesias; throbbing headaches associated with nausea; back and chest pain, which was constant and aching; puritic rash over the anterior tibial areas; inability to concentrate and memory deficits; subjective fever with chills and sweats; frontal hair loss; depression, irritability and emotional lability (or instability); episodic diarrhea and constipation; periodic sore throat, and recurrent yeast vaginitis. According to Dr. Flowers, plaintiff stated that she had been taking Paxil[1] since November of 1996 for nervousness. Dr. Flowers found the plaintiff to be overweight (242 pounds) with a blood pressure reading of 140/94. Based on the plaintiff's description of her symptoms and the routine tests performed by Dr. Terry at MEA Medical Clinic, Dr. Flowers gave a diagnosis of "probable chronic fatigue syndrome," stating that the plaintiff met the 1988 Center for Disease Control criteria[2] for this condition (at least four persistent symp-

---

1. Paxil (Paroxetine) is a drug used to treat social anxiety disorder (often experienced as extreme shyness), panic disorder, depression, and obsessive compulsive disorder.

2. The 1988 CDC criteria (modified slightly in 1994) are as follows: [d]oes the patient have four out of ten of the classic symptoms that have been present chronically or intermittently for at least six months like: (1), fever

toms for at least six months).[3] Dr. Flowers says in his notes that he then encouraged the plaintiff to apply for disability benefits. Plaintiff applied for disability benefits on January 30, 1997, one day after her consultation with Dr. Flowers, alleging that she had become disabled on August 27, 1996, during the period of time she had been diagnosed by Dr. Terry to be suffering with mononucleosis.

After the plaintiff filed for disability, the Mississippi Disability Determinations Service (DDS) sent a Disability Report Form MSD01–SUP to Dr. Joseph Terry. Dr Terry completed this form on February 17, 1997, stating in the "Remarks" section that the plaintiff could perform sedentary work at home three to four hours per day.[4] Dr. Terry offered no particular basis for this remark. Dr. Terry also repeated that his previous diagnosis of the plaintiff had been mononucleosis. He added that the plaintiff probably had Chronic Fatigue Syndrome. He also stated that the plaintiff did not suffer from any underlying mental disorder that significantly interfered with her functioning. The Magistrate Judge points out that the Disability Report Form was unaccompanied by any record of the plaintiff's treatment by Dr. Terry.

On February 26, 1997, the plaintiff saw Dr. Flowers again, complaining of daily headaches and dizziness. On April 30, 1997, Dr. Flowers reported that plaintiff's headaches had responded to Diamox, a drug prescribed for headache pain, but that her other symptoms continued. In a report dated May 29, 1997, Dr. Flowers

and/or chills; (2) sore, scratchy relapsing, throat problem; (3), lymphatic soreness or swelling in at least two sites; (4), muscle discomfort, flu-like muscle aches; sore muscles to touch; (5), fibromyalgia with 8 out of 18 classic tender spots; (6), generalized weakness; (7), joint discomfort: migratory and asymmetrical involving large joints more than small; (8), headache—new onset pressure type: *retro-orbital and occipital that worsens with stress and exertion;* (9) sleep disturbances and hypersomnolence (10/hrs/night plus naps); and (10), chronic frequent nausea.

*See* Stephen B. Edelson, M.D., *Chronic Fatigue Immune Dysfunction Syndrome,* 1995.

3.  According to the Center for Disease Control (CDC), no tests can be recommended for the specific purpose of diagnosing chronic fatigue syndrome. Tests, says the CDC, should be directed toward confirming or excluding other possible clinical conditions. Examples of specific tests that do not confirm or exclude the diagnosis of chronic fatigue syndrome, says the CDC, include serologic tests for Epstein–Barr virus, enteroviruses, retroviruses, human herpesvirus 6, and Candida albicans; tests of immunologic function, including cell population and function studies; and imaging studies, including magnetic resonance imaging scans and radionuclide scans (such as single-photon emission computed tomography

and positron emission tomography). Dr. Flowers conducted no tests himself, but relied on the routine medical tests conducted by Dr. Terry, including a chest x-ray (normal); liver tests (normal); blood tests (consistent with previous infection); serum chemistry (normal); glucose 150 (elevated); platelet count (normal); and a "TSH," a test that measures the amount of the hormone TSH in the blood (normal). After hearing the plaintiff's complaints and looking at the MEA Medical Clinic record, Dr. Flowers simply noted that chronic fatigue syndrome probably was indicated.

4.  The opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. See *Leggett v. Chater,* 67 F.3d 558, 566 (5th Cir. 1995); and *Greenspan v. Shalala,* 38 F.3d 232, 237 (5th Cir.1994). However, even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, *"the ALJ has sole responsibility for determining a claimant's disability status." Paul v. Shalala,* 29 F.3d 208, 211 (5th Cir.1994). The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. *Id.* A treating physician's opinions are not conclusive, and they may be assigned little or no weight when good cause is shown. *Greenspan,* 38 F.3d at 237.

noted that the plaintiff was complaining of memory loss. Dr. Flowers' gave his impression of the plaintiff's condition as of this date as moderately active and stable chronic fatigue syndrome.

On June 24, 1997, Dr. Flowers wrote a "to whom it may concern" letter under his own clinic heading. In this letter, addressed to no one in particular, he stated that the plaintiff had made no significant improvement since he first had evaluated her six months earlier, and that he believed she was totally disabled from chronic fatigue syndrome. Dr. Flowers concluded, significantly, that he could not predict when she could return to work, suggesting that what he believed to be "total" might not be permanent. Dr. Flowers made no reference to the condition known as fibromyalgia.[5]

In June of 1997, after the plaintiff's application for disability was denied by DDS,[6] the plaintiff's attorney arranged for the plaintiff to be evaluated by Dr. Richard Strobach, a psychiatrist. Dr. Strobach's observations are contained in a letter to the plaintiff's attorney dated June 27, 1997.[7] Dr. Strobach's impressions included the plaintiff's frequently losing her train of thought; trouble with concentration and comprehension; the necessity of having to reword and repeat questions in order for the plaintiff to understand his questions; plaintiff's exhaustion; and her pain. Dr. Strobach found the plaintiff cooperative, with no appearance of malingering, and noted that the plaintiff appeared to be oriented to time and place. According to Dr. Strobach, plaintiff had significant cognitive impairments. He based this observation on a concentration test which showed that she had a slow ability with serial seven subtraction from one hundred, but that she performed well with serial two subtraction from one hundred. Dr. Strobach noted that the plaintiff could repeat six digits in forwards fashion but only three in backwards fashion. He described her recent memory as markedly impaired, in that she could not recall any of three objects after five minutes. He opined that plaintiff had moderately severe to severe restrictions of daily activities, due to her severe fatigue, pain, confusion, decreased concentration, decreased memory, and inability to withstand stress; moderately severe to severe constriction of interests; moderately severe to severe deterioration of personal habits; moderately severe to severe impairments in relating to other persons; and a moderately severe to severe impairment in her ability to make vocational adjustments. Dr. Strobach concluded that the plaintiff's ability to comprehend and follow instructions, ability to perform complex tasks, and ability to perform varied tasks all were impaired. He found her ability to perform simple tasks, and to perform repetitive tasks to be impaired from a moderately severe to a severe degree. Dr. Strobach's diagnosis was mood disorder and dementia due to chron-

**5.** The Magistrate Judge found that Dr. Flowers concluded that the plaintiff was disabled due to chronic fatigue syndrome and fibromyalgia, even though Dr. Flowers said nothing about a fibromyalgia based disability. According to the Center for Disease Control, these two medical conditions can and often do occur simultaneously.

**6.** On March 13, 1997, the DDS found that the plaintiff's disabling condition, chronic fatigue syndrome due to mononucleosis, was not expected to last for twelve consecutive months and that the plaintiff's ability to work should not be significantly affected after this period of time had passed. Reconsideration was denied on June 6, 1997.

**7.** In an independent disability evaluation conducted by Dr. Howard T. Katz with the Gulf States Rehabilitation Associates, Ltd., which is dated October 21, 1998, Dr. Katz notes that Dr. Strobach's report, "reads more like a position statement on chronic fatigue syndrome."

ic fatigue immune deficiency syndrome, and his opinion of the plaintiff's psychiatric prognosis was poor.

In August of 1997, the plaintiff returned to Dr. Flowers. His notes indicate that she was not depressed, was not particularly anxious, and that medication was helping her musculoskeletal pain, insomnia and headaches.

In February of 1998, the plaintiff reported to Dr. Flowers, stating that she had been feeling worse over the past three months. Dr. Flowers noted that she was grinding her teeth habitually (a condition known as Temporo–Mandibular Joint Syndrome (TMJ)); that she reported body pain; that she denied having any problems with depression; and that she had visited one Dr. D.B. Burton, Ph.D., a psychologist who had found no demonstrable cognitive problems but had suspected some depression. Dr. Flowers' impression was chronic fatigue syndrome and, for the first time, fibromyalgia.

### TESTIMONY BEFORE THE OFFICE OF HEARINGS AND APPEALS

#### A. The Plaintiff's Testimony

The ALJ's hearing was conducted on April 6, 1998. The plaintiff told the ALJ that she was suffering from burning pain between her shoulders, severe joint pain in her shoulders, elbows, wrists, hand and legs, sleeping problems and hair loss. Plaintiff stated that at night she experienced jerking in her legs, and that she had severe headaches during the day. Plaintiff said that she treated her pain with heat and cold packs, and with pain medication. Her daily activities, said plaintiff, included watching television, some reading, using her computer, occasional light cooking, washing clothes, and occasional dusting. Plaintiff said that she was unable to sit or stand for long periods, and that her husband and her mother performed most of the household chores. Plaintiff acknowledged that she was able to drive a car when necessary, to go shopping occasionally, and to church on Sunday. Plaintiff also said that some mornings she had not gotten dressed for the day, and that her husband had to help her dry her hair because she had not been able to hold her arms up. Other problems related to the ALJ by the plaintiff included trouble with reading due to the inability to concentrate; problems with memory loss; and general depression due to her medical condition.

#### B. The Vocational Expert's Testimony

Juanita Spann, a vocational expert, responded to three hypothetical circumstances posed by the ALJ. The first hypothetical, the one ultimately relied upon by the ALJ in reaching his decision, required the vocational expert to consider the following factors:

[A] 39 year old female with 16 years of education, who could lift 20 pounds occasionally and ten pounds frequently, sit six hours, stand or walk six hours, occasionally stoop, crouch, kneel, but who could never use ladders or ropes, who could not perform repetitive overhead reaching, who could not work in temperature extremes, and who had the ability to understand, remember and follow simple instructions.

The expert testified that such a person could not perform the plaintiff's past work as a school teacher, salesperson or hairdresser, but that such a person could perform light, unskilled work, such as the work of a garment inspector, amusement and recreation attendant, and usher. According to the vocational expert, these jobs existed in significant numbers in the national economy.[8]

---

8. A vocational expert is called to testify because of this person's familiarity with job requirements and working conditions. *Fields*

*v. Bowen,* 805 F.2d 1168, 1170 (5th Cir.1986). "The value of a vocational expert is that he

For the second hypothetical, the ALJ asked the vocational expert to consider the same person, with the exception that the person could perform only sedentary work. The expert testified that there would still be work that such a person could perform, giving as examples ticket taker, ticket seller and charge account clerk.

Finally, in the ALJ's third hypothetical, the vocational expert was asked to consider a person with the same characteristics, except that this person could not work for eight hours a day, forty hours a week due to chronic fatigue. The vocational expert testified that there would be no jobs that such a person could perform under these circumstances.

After the ALJ completed questioning the vocational expert, the plaintiff's attorney posed a fourth hypothetical, asking the vocational expert to consider an individual of the same age, educational background and work experience of the plaintiff, who suffered from chronic fatigue syndrome with depressive symptoms, who was unable to concentrate, and who experienced moderately severe to severe restrictions of daily activities. The vocational expert testified that such a person could not perform any kind of work.

### THE ALJ'S ANALYSIS

In evaluating a disability claim, the ALJ is to engage in a well-established five-step sequential process, determining: (1), whether the claimant is presently engaging in substantial gainful activity; (2), whether the claimant has a severe impairment; (3), whether the impairment is listed, or equivalent to an impairment listed, in appendix I of the regulation; (4), whether the impairment prevents the claimant from doing past relevant work; and (5), whether the impairment prevents the claimant from performing any other substantial gainful activity. *See Leggett v. Chater,* 67 F.3d 558, 564 n. 2 (5th Cir. 1995).

The ALJ determined that the plaintiff was not engaged in substantial gainful employment. He then determined that she had the severe impairments of chronic fatigue syndrome, an affective disorder, and obesity, but that she did not have any listed impairment or any impairment or combination of impairments equal in severity to a listed impairment under Appendix 1, Subpart P, Regulations No. 4.[9] The ALJ concluded that the impairments the plaintiff suffered prevented her from performing her past relevant work, such as school teacher, salesperson and hairdresser. However, the ALJ found that the plaintiff had a residual functional capacity to perform the requirements of work[10] except

(or she) is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Id.* A vocational expert explains the availability of certain jobs in the national economy by referring to the Dictionary of Occupational Titles (DOT), in conjunction with additional sources. *See Vaughan v. Shalala,* 58 F.3d 129, 131–32 (5th Cir.1995).

9. The subparts of this regulation provide that a claimant who meets the specific listed requirements, or demonstrates similar disqualifications of equal severity, will automatically be deemed disabled by the Secretary. The regulations recognize that certain impairments are so severe that they prevent a per-

son from pursuing any gainful work. A claimant who establishes that he suffers from one of these impairments will be considered disabled without further inquiry. *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983).

10. The residual functional capacity assessment is based on all of the evidence the ALJ has, including any statements regarding what the claimant can still do that have been provided by treating or examining physicians, consultative physicians, or any other medical or psychological consultant designated by the Commissioner. See 20 CFR § 404. 1545. For cases at the Administrative Law Judge hearing or Appeals Council level, the respon-

for tasks at a restricted range of light work activity.[11] From his assessment of the medical records and the DDS finding, the ALJ concluded that the plaintiff could lift up to 20 pounds occasionally and up to 10 pounds frequently; that she could occasionally crouch, stoop and kneel; and that she was able to understand, remember and follow simple instructions to complete simple, repetitive tasks. The ALJ also concluded that the plaintiff was limited to low-stress work. While the ALJ considered the plaintiff's subjective complaints, he found them credible only to the extent that they rendered the plaintiff unable to do anything other than light work. The ALJ's finding of residual functional capacity was consistent with the first two hypothetical circumstances posed to the vocational expert.

Regarding the opinions of the plaintiff's two treating physicians, Dr. Terry and Dr. Flowers, as to the extent of the plaintiff's impairments, the ALJ stated that Dr. Flowers' opinion was inconsistent with other substantial evidence. The ALJ noted that Dr. Flowers had opined that the plaintiff had been disabled since August of 1996, even though Dr. Flowers had not evaluated the plaintiff until January of 1997. The ALJ also found inconsistent Dr. Flowers' statement that the plaintiff was "disabled as a result of CFS" when Dr. Flowers also had concluded that the plaintiff's chronic fatigue syndrome had been on other occasions "moderately active and stable," rather than disabling.

Regarding Dr. Terry's opinion, the ALJ concluded that Dr. Terry was not persuasive because Dr. Terry had not examined the plaintiff after January of 1997, and could not assess whether the plaintiff's condition could improve over a twelve month period. The ALJ found Dr. Terry's statement concerning the plaintiff's abilities to be inconsistent with the plaintiff's own description of her daily activities. Thus, whether the ALJ relied on the vocational expert's response to the first or second hypothetical question, either of these responses supported a determination of non-disability. The ALJ did not follow the hypothetical question submitted to the vocational expert by the plaintiff's attorney. Having found that the plaintiff had a residual functional capacity to do certain light work, the ALJ apparently found that the substantial evidence did not support the attorney's insertion of moderately severe to severe restrictions of daily activities into the hypothetical question.

Thus, the ALJ entered a determination of not disabled under the applicable law and regulations, and the plaintiff appealed to the Appeals Council for the Social Security Administration in Washington, D.C.

### THE APPEALS COUNCIL AFFIRMS THE ALJ's FINDINGS

The plaintiff's attorney submitted a letter brief to the Appeals Council on July 30, 1998, contending that the ALJ should have given the statements of Dr. Flowers and Dr. Terry full weight and should have found them to be controlling with regard to the ALJ's disability determination. The plaintiff's attorney also contended that the ALJ should have relied on the fourth hypothetical consideration, rather than the first or second, because only the fourth, in the attorney's opinion, contained all the plaintiff's impairments.

---

sibility for deciding residual functional capacity rests with the Administrative Law Judge or Appeals Council.

**11.** Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.

Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. *Carry v. Heckler,* 750 F.2d 479, 482–83 (5th Cir.1985).

Plaintiff also submitted a rehabilitation evaluation performed by Dr. Howard Katz on October 21, 1998. Dr. Katz reviewed all the plaintiff's medical records, including those from Dr. Terry, Dr. Flowers, Dr. Strobach and Dr. Burton. The Magistrate Judge incorrectly reports that it was Dr. Katz who concluded that plaintiff could not teach school; that she could not stand or walk for eight hours; that she could not stay awake and participate in activities for eight hours straight; and that she was restricted in repetitive movements, bending, climbing, stooping, kneeling, squatting, lifting, pushing and pulling. However, close review to the record at page 181 shows that this was the conclusion of Dr. D.B. Burton, Ph.D., the psychologist from University Medical Center in Jackson, Mississippi, who found that plaintiff suffered no demonstrable cognitive problems, but who suspected some depression.

Dr. Katz concluded from all the medical records that the plaintiff would benefit from a slowly progressive exercise program, massage therapy, regular counseling for her sleep disorder, trigger point injections for pain, and myofascial release and massage. Dr. Katz also recommended that the plaintiff should have only one physician consulting with her and making medical decisions about her chronic fatigue syndrome. Dr. Katz's conclusions were based solely on the plaintiff's medical records. He did not perform a medical examination of the plaintiff himself, and he made no specific comment which could be construed as a finding of disability. Instead, Dr. Katz opined that the plaintiff's condition could be improved if she were to follow his recommendations for treatment.

On February 11, 2000, the Appeals Council of the Social Security Administration informed the plaintiff's attorney that her request for review had been denied. The Appeals Council found no basis for changing the ALJ's decision. The plaintiff then filed this appeal.

## ANALYSIS

The Magistrate Judge correctly noted that his review was limited to a determination of whether the ALJ's (or the Commissioner's) decision had been supported by substantial evidence existing on the record as a whole and whether any errors of law had been made. *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir.1988) (*Neal v. Bowen*, 829 F.2d 528, 530 (5th Cir.1987)). These cases note that the court must refrain from reweighing the evidence, trying the issues de novo, or substituting its judgment for that of the ALJ or the Commissioner. *See Abshire*, 848 F.2d at 640.

Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance, A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. In applying this standard, the court must not re-weigh the evidence or substitute its judgment for that of the Commissioner. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000), quoting *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir.1995), and citing *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir.1988). So, this court must affirm the Commissioner's determination unless this court finds that 1) the ALJ applied an incorrect legal standard, or 2) that the ALJ's determination was not supported by substantial evidence. *Boyd v. Apfel*, 239 F.3d 698, *704 (5th Cir.2001)

█ The Magistrate Judge concluded that the ALJ committed errors of law in reaching his decision when he "rejected" the opinions of the plaintiff's two treating physicians. The Magistrate Judge stated that there was "nothing inconsistent or suspicious about Dr. Flowers' concluding, based upon Dr. Terry's assessment and

plaintiff's description of her symptoms, that plaintiff had become disabled several months before he personally evaluated her. Furthermore, there is no inconsistency between Dr. Flowers' opinion that she is disabled due to CFS and his assessment of her CFS as 'moderately active and stable.'" This court disagrees.

First, Social Security Ruling ("SSR") 96–2p states that "[A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques, or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." In the instant case the ALJ specifically stated that he could not find the opinions of Dr. Flowers and Dr. Terry to be controlling or even persuasive, given

their inconsistencies. The ALJ did not say that these opinions were "rejected." Moreover, given the ALJ's finding that the plaintiff had impairments that limited her work activity, it is apparent that he gave the medical records some weight. He simply rejected the conclusions of the doctors that the plaintiff was disabled under the law, noting that this determination was reserved for the Commissioner. *See Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir.1994) (the ALJ has sole responsibility for determining a claimant's disability status). The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. *Id.*

Recently, in the case of *Newton v. Apfel*, 209 F.3d 448, 456–57 (5th Cir.2000), the Fifth Circuit stated that an ALJ is required to consider each of the factors under 20 CFR § 404.1527(d)(2)[12] when the

**12.** Title 20 CFR. § 404.1527(d)(2) provides that, "[r]egardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion."

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. *When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in deter-*

*mining the weight to give the opinion.* We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the

ALJ intends to reject or give little weight to a treating specialist's opinion, citing *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir.1998); *Goatcher v. U.S. Department of Health & Human Services*, 52 F.3d 288, 290 (10th Cir.1995); and *Dwyer v. Apfel*, 23 F.Supp.2d 223, 228 (N.D.N.Y.1998). The list factors given by the Fifth Circuit which an ALJ must consider to assess the weight to be given to the opinion of a treating physician when the ALJ determines that it is not entitled to "controlling weight are: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician."

This court finds that from the medical records the ALJ considered and specifically noted the length of time both Dr. Terry and Dr. Flowers had treated the plaintiff. The medical records considered by the

ALJ listed the frequency of the plaintiff's examinations. The nature and extent of the treatment relationship was considered by the ALJ when he noted Dr. Flowers conclusion of disability in August of 1996, even though he did not examine the plaintiff until January of 1997. The ALJ also noted that Dr. Terry did not examine the plaintiff again after his referral of the plaintiff to Dr. Flowers. The ALJ concluded that the substantial evidence did not support these doctors' conclusions that the plaintiff was disabled, and that the doctors' opinions were internally inconsistent, as well as unsupported. Finally, the medical records revealed to the ALJ that Dr. Terry was a general practitioner while Dr. Flowers was an internist. In sum, the ALJ acknowledged his duty to give controlling weight to the doctors' opinions unless they were inconsistent with other substantial evidence. In this court's view, the ALJ adequately performed the *Newton* analysis under 20 CFR § 404.1527(d)(2).

█ The Magistrate Judge also determined that the ALJ erred in relying upon the first hypothetical question he posed to

neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a non-treating source.
Title 20 CFR § 404.1527(3), (4), (5) and (6) provide as follows:
(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.
We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

**536**

the vocational expert. This court finds, contrary to the Magistrate Judge, that the ALJ's finding is consistent with both the first and the second hypothetical question posed. This court also finds that the record contains substantial evidence to support the ALJ's decision not to accept the plaintiff's insertion of the impairments of moderately severe to severe impairment of the plaintiff's daily activities. Moreover, while the plaintiff has given account of her pain and limitations which were considered by the ALJ, the plaintiff has offered no evidence that she was incapable of performing light work of the types the ALJ determined were available and that she was capable of performing. The conclusory statements of the plaintiff's doctors that she was able to work at home for three to four hours (Dr. Terry's January 1997 report), and/or that she had been disabled since August of 1996 (Dr. Flowers' January 1997 report) are simply not enough to meet the plaintiff's burden of proof under the disability test. *Vaughan v. Shalala,* 58 F.3d 129, 132 (5th Cir.1995), citing *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir. 1990).

### CONCLUSION

The ALJ had a duty to develop the facts fully and fairly relating to the applicant's claim for disability benefits. *Newton v. Apfel,* 209 F.3d at 458, quoting *Ripley v. Chater,* 67 F.3d 552, 557 (5th Cir.1995). Having reviewed the entire record, this court finds that the ALJ satisfied this duty and that the decision of the Commissioner should be sustained. Therefore, this court affirms the decision of the Commissioner. In so holding, this court declines to adopt the Report and Recommendation of the United States Magistrate Judge to remand this case for a determination of benefits; rather this court hereby sets aside that Report and Recommendation.

### FINAL JUDGMENT

This matter, having come on before this court pursuant to the Report and Recommendation of United States Magistrate Judge James C. Sumner, and this court, having declined to adopt said Report and Recommendation, hereby sets aside the Report and Recommendation of the Magistrate Judge and affirms the decision of the Commissioner of the Social Security Administration. Therefore, judgment is entered for the Commissioner of the Social Security Administration, and this above-styled and numbered cause hereby is dismissed.